**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5327

FREDERICK JERMAINE POINDEXTER,
a/k/a Curtis Davis,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CR-94-483-A)

Argued: March 7, 1997

Decided: September 18, 1997

Before HAMILTON, Circuit Judge, KISER,
Senior United States District Judge for the
Western District of Virginia, sitting by designation, and
GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion. Judge Goodwin wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Dennis F. Nee, Washington, D.C., for Appellant. Bernard
James Apperson, III, Assistant United States Attorney, UNITED

STATES ATTORNEY'S OFFICE, Alexandria, Virginia, for Appellee. **ON BRIEF:** Bernard S. Grimm, Washington, D.C., for Appellant. Helen F. Fahey, United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Following a jury trial, Frederick Jermaine Poindexter was convicted of: (1) conspiracy to possess cocaine with the intent to distribute, see 21 U.S.C. §§ 841(a)(1) and 846; (2) aiding and abetting the possession of cocaine with the intent to distribute, see 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and (3) interstate travel in aid of racketeering, see 18 U.S.C. § 1952. On appeal, Poindexter challenges: (1) the district court's denial of his motion to suppress; (2) certain evidentiary rulings made by the district court; and (3) the sufficiency of the evidence to support his convictions. For the reasons stated below, we affirm.

I

On October 17, 1994, Poindexter and Thomas Lee Cheung traveled on American Airlines Flight 36 from Los Angeles, California to Dulles International Airport, located near Washington, D.C. Poindexter and Cheung checked in at the airport in Los Angeles just before Flight 36 departed, having made their reservation for Flight 36 at a travel agency less than thirty minutes prior to Flight 36's scheduled departure. Neither Poindexter nor Cheung checked any luggage.

After Flight 36 arrived at Dulles Airport, Drug Enforcement Administration (DEA) Task Force agents followed Poindexter and Cheung from the gate to the terminal's upper level exit; the upper

2

level of the terminal is for passenger drop-offs so there is no departing ground transportation. The agents followed Poindexter and Cheung because they fit the description of two suspected drug traffickers on Flight 36 provided by DEA agents in Los Angeles. The information conveyed by the DEA in Los Angeles included: (1) that two men had purchased two one-way tickets, paying in cash, for Flight 36;[1] (2) that the two men purchased their tickets at a travel agency less than thirty minutes prior to Flight 36's departure;[2] (3) that the two men arrived at the gate just before the plane departed and checked no luggage; and (4) a detailed description of each man: (a) "a black male flying under the name of Curtis Davis, five foot ten, 200 pounds, approximately 20 years old wearing a white sweatshirt"; and (b)"an Hispanic male flying under the name of Tony Lewis, five foot ten, wearing a green shirt."

Prior to Flight 36's arrival at Dulles airport, a DEA Task Force agent at Dulles Airport, Agent Frank Oliff, confirmed, from American Airlines personnel, that two individuals flying under the names Curtis Davis and Tony Lewis were aboard Flight 36. Agent Oliff was further advised that the seat assignments for the tickets issued were next to each other.

As Poindexter and Cheung reached the terminal's exit, they were approached from behind by DEA Task Force agents. Poindexter and Cheung stopped before the terminal exit and spoke to each other. At this point, Poindexter and Cheung were able to observe the DEA Task Force agents through a reflection on the terminal exit's glass doors. Cheung then walked through the exit door, and Poindexter walked back in the direction they had come from.

_____

**1** At trial, there was no evidence introduced demonstrating that Poindexter paid for his ticket in cash. The government's evidence only established that Cheung's ticket was paid in cash.

**2** At trial, the government did not demonstrate that the tickets were purchased thirty minutes prior to Flight 36's scheduled departure. Rather, the government's evidence demonstrated that Cheung and Poindexter made their reservation for Flight 36 at the travel agency less than thirty minutes prior to Flight 36's scheduled departure.

Cheung was followed through the exit door by two DEA Task Force agents, Agent Oliff and Agent Arthur Jacobson. Agents Oliff and Jacobson identified themselves and asked Cheung to speak with them. During the encounter, Cheung clutched a duffle bag that he was carrying tightly against his chest. In the conversation that ensued, Cheung acknowledged that he had just arrived from Los Angeles. Cheung allowed the agents to view his airline ticket which reflected that it was issued for Flight 36 in the name of "Tony Lewis." Cheung stated that he was traveling alone and had no identification. Agent Oliff then asked if he could search the duffel bag. After Cheung refused, Agent Oliff told Cheung that he and the bag were being detained in order to allow a drug-sniffing dog (which was at the airport) to sniff the bag. A few moments later, Cheung threw the bag at Agent Oliff and bolted across the lanes of traffic and over the guardrail, dropping to the lower level of the airport. Cheung was eventually apprehended in the airport parking lot. Meanwhile, one of the DEA Task Force agents recovered a kilogram of cocaine from the duffel bag.

While Cheung was approached, Poindexter remained under the surveillance of other DEA agents. Poindexter was observed following Cheung's movements. When Agents Oliff and Jacobson approached Cheung, Agent William Buss overheard Poindexter mumble "shit." Agent Buss identified himself to Poindexter and asked to speak to him. During the conversation that ensued, Poindexter admitted that he had just gotten off Flight 36 and indicated that he was traveling alone and had no luggage. When asked his name, Poindexter replied "Poindexter." However, the name on the ticket that he produced for Agent Buss was in the name of "Curtis Davis." When asked how long he was in Los Angeles, Poindexter indicated that he was there for two days. During the encounter, Poindexter appeared nervous and fidgety.

Agent Buss then asked Poindexter if he could search him, and Poindexter replied "go ahead." When Agent Buss discovered a pager inside Poindexter's waistband, Poindexter became agitated and belligerent and asked why he was picked for the interview. Agent Buss responded by asking Poindexter why he was traveling under an assumed name, why he had no luggage, and why he lied about traveling alone, but Poindexter did not respond.

4

At this point, Agent Jacobson approached Agent Buss and Poindexter. Agent Jacobson informed Agent Buss that Agent Oliff had requested a drug-sniffing dog for the duffel bag that Cheung carried. Poindexter then asked Agent Buss if he was under arrest. Agent Buss told Poindexter that he was not but was nevertheless being detained while he (Agent Buss) went for the drug-sniffing dog.

While Agent Jacobson was waiting with Poindexter, Agent Oliff ran past in pursuit of Cheung, who had fled. Agent Oliff instructed Agent Jacobson to handcuff Poindexter. After the cocaine was discovered in the duffel bag and Cheung was apprehended, Poindexter was arrested. Recovered from him following his arrest was, among other things, a pager, which repeatedly went off during Poindexter's booking.

On October 18, 1994, a federal grand jury sitting in the Eastern District of Virginia returned a four-count indictment against Poindexter and Cheung. Count I of the indictment charged Poindexter and Cheung with conspiracy to possess cocaine with the intent to distribute, see 21 U.S.C. §§ 841(a)(1) and 846. Count II charged Cheung with possession of cocaine with the intent to distribute, see 21 U.S.C. § 841(a)(1). Count III charged Poindexter with aiding and abetting the possession of cocaine with the intent to distribute, see id. and 18 U.S.C. § 2. Count IV charged Poindexter with interstate travel in aid of racketeering, see 18 U.S.C. § 1952.

Prior to trial, Poindexter moved to suppress the pager recovered from his person following his arrest. The district court denied the motion. At trial, the government's evidence centered around the facts and circumstances leading up to Poindexter's arrest. In addition, the government introduced evidence that a few months before Poindexter's trip to Los Angeles, he purchased an automobile, paying $11,000 in cash, when he already owned an automobile and was unemployed. The government also introduced evidence of a larger, ongoing business enterprise reflected in repeated and interconnected telephone activity, occurring both before and after Poindexter's arrest. The government's evidence showed that a person using the name "Tewana Freeman" checked into a Best Western Hotel in Connecticut the same day that Poindexter and Cheung traveled from Los Angeles with the cocaine (October 17), with a scheduled departure date of October 19.

5

Shortly after Poindexter and Cheung were arrested, a call was placed from the Best Western to Poindexter's pager, and to Cheung's home phone.

On October 18, the day after Poindexter and Cheung were arrested, a telephone call was placed from Cheung's residence to the Best Western. That same day, a call was placed from the Best Western to Cheung's pager. There was also a call on this date from the Best Western to Poindexter's pager. The person registered as Tewana Freeman checked out of the Best Western on October 18.

On October 19, a call was made from Tewana Freeman's number[3] to Cheung's home telephone. On October 21, there was another call made from the Tewana Freeman number to Poindexter's home telephone. Other telephone activity connected Poindexter to an ongoing business enterprise. A number which was displayed on Poindexter's pager just after his arrest was a pager number in Los Angeles. This Los Angeles pager number had previously been called by Poindexter from his home nineteen times between September 8 and October 18. Following his arrest, Poindexter called his house. Shortly thereafter, a call was placed from Poindexter's house to the pager number in Los Angeles.

Following their trial, Poindexter and Cheung were convicted on all counts. Poindexter was sentenced to sixty-three months' imprisonment.[4] Poindexter noted a timely appeal.

II

Poindexter contends that the district court erred when it refused to

---

[3] This was the home number in Maryland given by the person registering as Tewana Freeman at the Best Western. Back in September, a call had been placed from the Tewana Freeman number to Poindexter's pager. Even earlier, back in August, the person using the name Tewana Freeman had previously checked into the same Best Western, and a call was placed from the hotel to Cheung's pager. The Tewana Freeman number was later transferred to Cheung's home telephone number.

[4] The record does not reflect the nature of Cheung's sentence.

6

suppress the pager recovered from his person following his arrest. We disagree.

Poindexter was seized at the moment he was told he was being detained so that the agents could obtain the drug-sniffing dog. See generally Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968) (Under the Fourth Amendment, a seizure occurs "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."). Accordingly, we must resolve whether Poindexter's detention at that time was justified. To justify a seizure, officers must have a reasonable, articulable suspicion that the suspect is presently engaged in criminal activity. See United States v. Sokolow, 490 U.S. 1, 7 (1989). "Reasonable suspicion" is "more than an inchoate and unparticularized suspicion or hunch." Id. (quoting Terry, 392 U.S. at 27) (internal quotes omitted). It is a concept that "is not `readily, or even usefully, reduced to a neat set of legal rules.'" Id. (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). In determining whether a reasonable suspicion existed, we must consider the "totality of the circumstances." Id. at 8. In the final analysis, the analytical process requires a practical determination; it "does not deal with hard certainties, but with probabilities." United States v. Cortez, 449 U.S. 411, 418 (1981). We must reach "a common sense conclusion" as to whether the articulable facts to which the agents point reasonably would raise a suspicion that Poindexter was "engaged in wrongdoing." Id.

At the time of Poindexter's seizure, the agents knew or had been informed that Cheung and Poindexter: (1) traveled together from a known source city; (2) arrived at the gate just moments before Flight 36's scheduled departure; (3) had adjoining seat assignments; (4) had purchased one-way tickets in cash; (5) checked no luggage; and (6) split up after seeing the DEA Task Force agents approach them from behind. The agents also knew that Poindexter: (1) traveled under an alias; (2) carried a pager; (3) became agitated when the pager was discovered; (4) was extremely nervous; (5) mumbled "shit" when Agents Oliff and Jacobson approached Cheung; and (6) denied he was traveling with anyone. While "[p]erhaps none of [the] facts [of this case], standing alone, would give rise to a reasonable suspicion" of drug trafficking, we are satisfied that, "taken together as appraised by an experienced law enforcement officer, they provided clear justifica-

7

tion," United States v. Sharpe, 470 U.S. 675, 682 n.3 (1985), to seize Poindexter. See Sokolow, 490 U.S. at 8-11 (concluding that agents had reasonable suspicion justifying stop where defendant: (1) paid $2,100 for two round-trip plane tickets; (2) traveled under an alias; (3) traveled from a source city for narcotics; (4) stayed in the source city for forty-eight hours; (5) appeared nervous during his trip; and (6) checked no luggage).**5**

The remaining question is whether the agents were justified in handcuffing Poindexter after Cheung fled. In our view, Cheung's actions permitted Poindexter's continued detention, and in light of Cheung's flight and the agents' scramble to chase him, it was certainly reasonable for the agents to handcuff Poindexter as Agent Oliff instructed. See United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989) (use of handcuffs on defendant during encounter permissible where officer could reasonably anticipate that he might be required to go and aid his fellow officers who were chasing codefendant in an effort to apprehend codefendant); United States v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986) (holding that use or display of force will not convert stop into arrest); cf. United States v. Perate, 719 F.2d 706, 708-09 (4th Cir. 1983) (fact that officers approached suspect's car with drawn weapons did not convert stop into an arrest). After the discovery of the cocaine in the duffel bag, there was probable cause to arrest both Cheung and Poindexter. See Beck v. Ohio, 379 U.S. 89, 91 (1964) (Probable cause to arrest exists if "at the moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."). The pager was, therefore, properly admitted at trial because it was recovered incident to Poindexter's arrest. See United States v. Robinson, 414 U.S. 218, 235 (1973) (police may conduct search of arrestee's person after a valid custodial arrest). Accordingly, the district court properly denied Poindexter's motion to suppress.

_____

**5** We also note that the intended length of the detention--in order to obtain the drug sniffing dog--was reasonable. See United States v. McFarley, 991 F.2d 1188, 1191-93 (4th Cir. 1993) (permitting brief detention of person and luggage when there was a reasonable suspicion that the luggage contained contraband).

8

III

Poindexter also challenges the district court's admission of evidence showing that, four months prior to the crimes charged, Poindexter purchased an automobile for $11,000 in cash, at a time when he was unemployed and already owned an automobile. This evidence was admissible in this drug trafficking prosecution as evidence of unexplained wealth. See United States v. Grandison, 783 F.2d 1152, 1156 (4th Cir. 1986) (holding evidence of "recently expended large sums of cash" relevant in narcotics prosecution as evidence of illegal dealings and ill-gotten gains); see also United States v. Penny, 60 F.3d 1257, 1263 (7th Cir. 1995) (evidence of unexplained wealth admissible if it creates a reasonable inference that the defendant was involved in a drug conspiracy or trafficking), cert. denied, 116 S. Ct. 931 (1996); United States v. Figueroa, 976 F.2d 1446, 1454 (1st Cir. 1992) ("Evidence that the defendant possessed or controlled substantial sums of money from unexplained sources is relevant in a prosecution for drug trafficking.").[6] Furthermore, this evidence was admissible to prove Poindexter's ongoing business enterprise, an element of the interstate travel in aid of racketeering count. See United States v. Monu, 782 F.2d 1209, 1211 (4th Cir. 1986) (the prosecution must show that the offense conduct was part of a "continuous enterprise," and not merely an isolated incident).[7]

_____

[6] The district court also allowed into evidence, over Poindexter's objection, the Virginia registration of the car he owned at the time he purchased the second automobile. Obviously, this evidence was admissible to show that Poindexter owned an automobile at the time he purchased the second automobile for $11,000 in cash.

[7] Poindexter also challenges the district court's admission of evidence showing that he called home following his arrest, and, thereafter, a call was placed from his house to the Los Angeles pager number. For obvious reasons, this evidence was admissible on the conspiracy count as well as the interstate travel in aid of racketeering count--the phone call activity as a whole supported: (1) the inference that a conspiracy existed and that Poindexter was a part of it; and (2) the inference that an ongoing business enterprise existed, a necessary element of the interstate travel in aid of racketeering count.

9

## IV

Poindexter also argues that there is insufficient evidence in the record to support each of his convictions. A defendant challenging the sufficiency of the evidence to support a conviction bears "a heavy burden." United States v. Hoyte, 51 F.3d 1239, 1245 (4th Cir.), cert. denied, 116 S. Ct. 346 (1995). In reviewing the sufficiency of the evidence supporting a criminal conviction, our role is limited to considering whether "there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). We must bear in mind that"[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994). Further, "if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." Id. Reversal for insufficient evidence is reserved for the rare case "where the prosecution's failure is clear." Burks v. United States, 437 U.S. 1, 17 (1978). In sum, we "may not overturn a substantially supported verdict merely because [we] find the verdict unpalatable or determine that another, reasonable verdict would be preferable." United States v. Burgos , 94 F.3d 849, 862 (4th Cir. 1996) (en banc), cert. denied, 117 S. Ct. 1087 (1997).

## A

To prove a conspiracy to possess cocaine with intent to distribute, the government must establish that: (1) an agreement to possess cocaine with intent to distribute existed between two or more persons other than government agents; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy. See Burgos, 94 F.3d at 857. In addition to proving the existence of a conspiracy beyond a reasonable doubt, the government must also prove a defendant's connection to the conspiracy beyond a reasonable doubt. See id. at 858. To satisfy that burden, the government need not prove that the defendant knew the particulars of the conspiracy or all of his conspirators. See id. Once it has been shown that a conspiracy exists, the evidence need only establish a "slight connection" between the defendant and the conspiracy to support conviction. See id. at 861. "The term `slight' does not describe the quantum of evidence that the government must elicit in order to

10

establish the conspiracy, but rather the connection that the defendant maintains with the conspiracy." Id. Because "a conspiracy is clandestine and covert, . . . a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced." Id. at 857. The circumstantial evidence can include "a variety of conduct, apart from selling narcotics." Id. at 859.

Poindexter contends that his conspiracy conviction must be reversed because the government failed to prove he participated in any conspiracy. We disagree. All of the evidence supporting Poindexter's detention at the airport supports an inference that Poindexter and Cheung conspired to possess cocaine with the intent to distribute. First, the duffel bag Cheung was carrying contained a kilogram of cocaine. Second, Poindexter and Cheung: (1) traveled together from a known source city; (2) made their reservations at a travel agency one minute apart and less than thirty minutes prior to Flight 36's scheduled departure; (3) had adjoining seat assignments; (4) purchased one-way tickets, with Cheung paying in cash; (5) checked no luggage; and (6) split up after seeing the agents approach them from behind. Third, Poindexter: (1) traveled under an alias (as did Cheung); (2) carried a pager; (3) became agitated when the pager was discovered; (4) was extremely nervous; (5) mumbled "shit" when he saw the DEA Task Force agents approach Cheung; and (6) denied he was traveling with anyone. Fourth, the government introduced evidence of interrelated phone call activity that suggested a larger, ongoing enterprise. There were calls from the Best Western to Cheung's home and pager number and Poindexter's pager. Furthermore, there were attempted contacts between Poindexter and the Los Angeles pager number both before and immediately following Poindexter's arrest. Finally, the government introduced evidence that a few months prior to Poindexter's arrest, the unemployed Poindexter purchased an $11,000 automobile when he already owned one. Burgos instructs us to focus "on the complete picture, viewed in the context and in the light most favorable to the Government, that all of the evidence portrayed." Id. at 863.**8** In our view, the evidence outlined above consti-

_____

**8** The dissent makes two fundamental flaws in its analysis. First, the dissent misconstrues our decision in Burgos as establishing a minimum of the quantum of evidence necessary to support a conspiracy conviction.

11

tutes sufficient evidence to support Poindexter's conspiracy conviction.**9**

_____

See post at 15 ("Surely Burgos expanded this court's conspiracy jurisprudence to its logical limits, and just as surely, this case exceeds those limits."). A careful reading of Burgos belies such an assertion. In fact, Burgos was not a close case and nowhere in the court's opinion does the court indicate that it was establishing a floor of any sort. Cf. Burgos, 94 F.3d at 871 ("Based on the plethora of evidence, we conclude that a rational jury could find beyond a reasonable doubt that Burgos participated in the conspiracy; indeed, we would be hard-pressed to accept that a jury could conclude otherwise."); id. at 872 ("In addition to the surfeit of evidence discussed thus far, both Gobern and Gonzales produced train tickets bearing the name `Anthony Flores.'"). Second, Burgos tells us not to "dissect[ ] the direct and circumstantial evidence by separately dismissing selective pieces," id. at 871, but that is exactly what the dissent does. Rather than analyze all of the evidence "in context," id., the dissent tells us why each piece of evidence standing alone is insufficient. Such an analysis obviously ignores the cumulative impact of evidence that when viewed in isolation may appear innocuous. The test is not whether Poindexter is "plausibly not guilty," id. (citation and internal quotes omitted), but rather whether a jury could properly convict Poindexter on the facts adduced at trial. Id. And the evidence adduced at trial, when viewed in context, yields one conclusion--there is substantial evidence in the record to support Poindexter's conspiracy conviction. The dissent's myopic view of the evidence is illustrated by the two questions it asks near the end of the opinion: "How many citizens travel together, know each other, know the same people, receive calls from common parties and carry pagers? If one of those persons carries drugs, should these associational facts be enough to convict the other of a criminal agreement?" Post at 28. If these questions accurately summarize all of the evidence against Poindexter adduced at trial then Poindexter's conviction should be reversed. But, as discussed in the opinion, Poindexter did much more than that and that is why his conviction must be affirmed.

**9** Poindexter also contends that the evidence is insufficient to support his conviction for aiding and abetting the possession of cocaine with the intent to distribute, see 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. We disagree. At trial, the government was required to prove beyond a reasonable doubt that Poindexter "knowingly associated himself with and participated in the criminal venture." Burgos , 94 F.3d at 873 (citation and internal quotes omitted). The criminal venture was the possession of cocaine with the intent to distribute. That requires the government to

12

B

To be convicted of interstate travel in aid of racketeering, see 18 U.S.C. § 1952, a "defendant must (1) travel in interstate or foreign commerce or use an interstate or foreign facility, such as the mail; (2) intend thereby to promote an unlawful activity; and subsequently promote or attempt to promote that unlawful activity." Monu, 782 F.2d at 1211. The unlawful activity may not be an isolated crime; rather the unlawful activity must be a part of a continuous enterprise. Id.

Poindexter argues that the government did not prove that he engaged in an ongoing business enterprise. This argument has no merit. The ongoing business enterprise element was met by the evidence concerning the quantity of cocaine recovered from the duffel bag (a kilogram), Poindexter's prior $11,000 cash purchase of an automobile when he was unemployed and already owned an automobile, the repeated interrelated phone call activity that occurred both before and after Poindexter's arrest, and the pager (which had nationwide coverage) recovered from his person following his arrest.

A similar argument to that raised by Poindexter was rejected in Monu. In that case, the defendant received a package from outside the country containing 135 grams of heroin. See id. at 1210. A search of the defendant's home revealed a triple-beam balance scale. See id. The defendant was convicted of, among other things, a § 1952 violation. The defendant challenged this conviction, contending that the government failed, among other things, to establish the ongoing business enterprise element. We rejected this contention:

_____

prove beyond a reasonable doubt: (1) the possession of cocaine; (2) knowledge of this possession; and (3) an intent to distribute. Id. "The same evidence establishing a defendant's participation in a conspiracy may support a conclusion that a defendant participated in the principal's unlawful intent to possess and distribute drugs, thereby proving guilt of aiding and abetting as well." Id. In our view, all of the evidence outlined in this section of the opinion concerning Poindexter's conspiracy conviction supports Poindexter's conviction for aiding and abetting the possession of cocaine with the intent to distribute.

13

> The requirement . . . that the unlawful activity be part of a continuous enterprise is satisfied by the evidence concerning the triple-beam balance scale. This tool indicates that Monu's receipt of the heroin was part of an ongoing enterprise, rather than an isolated instance of criminal conduct.

Id. at 1211.

Poindexter's pager and how it was employed,[10] coupled with Poindexter's prior $11,000 cash purchase of an automobile, the repeated interrelated phone call activity that occurred both before and after Poindexter's arrest, and the quantity of cocaine recovered from the duffel bag places this case squarely within the scope of Monu. Accordingly, we reject Poindexter's challenge to the sufficiency of the evidence supporting his interstate travel in aid of racketeering conviction.

V

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED

GOODWIN, District Judge, dissenting:

Frederick Jermaine Poindexter's conspiracy conviction is based on conjecture and upheld by surmise. Speculation and suspicion alone cannot legitimize a conviction that lacks proof beyond a reasonable doubt. Given the dearth of evidence and the government's reliance on untenable inference, the trial court should have withdrawn this case from the jury and granted a judgment of acquittal. [1] On appeal, I

---

[10] Courts have expressly found that pagers are relevant in drug cases because such devices are frequently used by persons involved in drug trafficking. See, e.g., United States v. Jaramillo-Suarez, 950 F.2d 1378, 1385 (9th Cir. 1991); United States v. Rogers, 918 F.2d 207, 212-13 (D.C. Cir. 1990).

[1] "Permissible inferences must . . . be within the range of reasonable probability . . . . [I]t is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." See Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir.), cert. denied, 358 U.S. 908 (1958).

14

believe that this court should reverse Poindexter's conviction.**2** I respectfully dissent and explain.

I. <u>A COMPARISON WITH</u> UNITED STATES V. BURGOS

In <u>United States v. Burgos</u>, five dissenting judges reiterated Justice Jackson's warning of nearly a half century ago:"[T]he history of the law of conspiracy exemplifies the tendency of a principle to expand itself to the limit of its logic." 94 F.3d 849, 877-78 (4th Cir.) (en banc) (Michael, J., dissenting) (citations and internal quotations omitted), <u>cert. denied</u>, 117 S. Ct. 1087 (1997). Surely <u>Burgos</u> expanded this court's conspiracy jurisprudence to its logical limits, and just as surely, this case exceeds those limits.

In 1996, this court upheld Frank Burgos's conspiracy conviction. To affirm the conviction, the court relied on physical evidence of the defendant's fingerprint on a plastic bag filled with cocaine base (crack cocaine).**3** The court also relied on an agent's testimony that Burgos admitted that he knew his coconspirators carried a package of crack cocaine and that they intended distribution at a North Carolina university. <u>See id</u>. at 871. Further evidence showed that the defendant purchased his train ticket and his coconspirators' tickets, all of which had

_____

**2** In considering an appeal from a trial court's denial of a Rule 29 motion, this court must ask whether a rational trier of fact, starting from a presumption of innocence, could have found the essential elements of the charged offenses beyond a reasonable doubt. <u>See Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>United States v. Wilson</u>, 115 F.3d 1185, 1190 (4th Cir. 1997). We view all of the evidence in the light most favorable to the government and grant it all <u>reasonable</u> inferences therefrom. <u>Jackson</u>, 443 U.S. at 319; <u>Wilson</u>, 115 F.3d at 119.

**3** Although the <u>Burgos</u> majority insisted otherwise, the critical piece of evidence in <u>Burgos</u> was the defendant's fingerprint, which appeared on the plastic bag filled with crack cocaine. <u>Burgos</u>, 94 F.3d at 864 (describing fingerprint as "most damning physical evidence"). The <u>Burgos</u> majority deemed the fingerprint so significant to the government's case that the majority discussed it no less than twenty-six times in its twenty-eight page opinion. One fingerprint discussion covers a full one and one-half pages. <u>Id.</u> at 864-65. The <u>Burgos</u> majority's repeated reference to the fingerprint belies any assertion that it was not a decisive factor in upholding Burgos's conviction.

15

identical return plans. The evidence also showed that Burgos knew one of the coconspirators before the train trip, and that he talked and shared food with both coconspirators during the trip. Government agents testified that the conspirators exchanged telephone numbers and attempted to leave the train station together. The government also introduced proof that a newspaper discarded in the North Carolina train station bathroom matched newspaper wrapped around the bag filled with crack cocaine. During trial, the defendant's testimony was conflicting and equivocal. See id.

In sum, the government's evidence in Burgos showed that Frank Burgos handled a bag containing crack cocaine, that he knew about his traveling companions' possession and plan to distribute the cocaine, and that he was closely associated with at least one of his coconspirators. Based on the aforementioned evidence, a majority of this court found that the jury made a reasonable inference when it determined that Burgos entered into an agreement to distribute cocaine with his traveling companions.

The evidence in this case differs significantly from that in Burgos because there is no proof connecting Poindexter with Cheung's cocaine. In contrast to the fingerprint offered in Burgos, in this case the government offered no physical evidence or testimony to show that Poindexter ever touched, carried, handled, or directed the handling of Cheung's bag. Poindexter's fingerprints were not found on Cheung's bag or on the bag's contents. Moreover, there is no evidence that Poindexter knew Cheung was carrying cocaine or that Poindexter knew Cheung intended to distribute the cocaine.[4] Instead, the government's evidence showed only a brief and ambiguous connection between Poindexter and Cheung. Unlike Burgos, in which the

_____

[4] As "evidence" of Poindexter's knowledge, the government speculated about an agent's testimony that Poindexter mumbled an obscenity in response to seeing Cheung approached by government agents. See Brief for the United States at 22 ("That he knew Cheung was carrying cocaine and that they were about to be caught is confirmed by Poindexter's crude, but poignant, statement when he saw federal agents approach his coconspirator with the cocaine -- `shit.'"). As discussed below, the government's explanation as to why Poindexter cursed is unsupported by the evidence.

16

government presented testimony that the defendant knew his traveling companions before the train trip, there is little evidence to show that Poindexter knew Cheung before the flight[5] or that the two men intended to travel together. The evidence only established that a travel agency entered Poindexter's and Cheung's airline reservations within one minute of each other and that their tickets were sequentially numbered.[6] The government offered no proof of when the tickets were purchased, who picked up the tickets, whether Poindexter purchased Cheung's ticket, or whether Poindexter purchased his own ticket.[7] And, unlike Burgos , in which the government presented evidence that the defendants sat together, exchanged food, and conversed, there is no evidence of association between Poindexter and Cheung except that the airline assigned the two men adjacent seats.[8] Whereas in Burgos, Frank Burgos attempted to depart the train station with his traveling companions after exchanging phone numbers with one of them, here there was only evidence that Poindexter and Cheung walked together after exiting the plane, spoke briefly, and parted company in the airport before being approached by agents and before attempting to exit the airport. In short, the government offered scant evidence to demonstrate a connection between Poindexter and Cheung.

## II. THE GOVERNMENT'S CASE

The government suggests that this case is about a"larger, ongoing business enterprise," the purpose of which was to obtain cocaine in Los Angeles, transport it across the country, and distribute it in Washington, D.C. The government presents "Darnell Harris," whom the government would have us believe arranged a cocaine sale for Poindexter. As "proof" that Harris arranged a sale, the government

---

[5] There was no evidence of any phone calls, pages, or other contacts between Poindexter and Cheung.

[6] The evidence also shows that Poindexter's ticket was issued in the name "Curtis Davis." However, unlike Cheung, Poindexter immediately gave his own name when questioned by authorities. J.A. at 287.

[7] Although Cheung's ticket was purchased with cash, no evidence was offered as to how Poindexter's ticket was purchased.

[8] There was no evidence that Poindexter and Cheung requested adjacent seats or that they actually sat together.

17

offers repeated calls from someone at Poindexter's residence to Harris's Los Angeles pager during the month preceding Poindexter's and Cheung's arrests. The government's conjecture continues with Poindexter and Cheung traveling to Los Angeles to purchase and transport cocaine. To explain the fact that Poindexter never handled the cocaine, the government supposes that Poindexter was the "finance man" and that he asked Cheung to carry the cocaine for him.[9] The government characterizes a postarrest call from Poindexter's residence to Harris's pager as a distress signal, designed to alert Harris that Poindexter and Cheung had been unsuccessful in their efforts to transport the cocaine. A "coconspirator" named Tewana Freeman materializes. Because she contacts both Poindexter and Cheung, Freeman becomes the government's link between the parties. For some inexplicable reason, however, Freeman is hundreds of miles away in a Connecticut Best Western on the same day the cocaine arrives in a Virginia airport. Yet the government insists, and the majority agrees, that this "evidence" proves Poindexter and Cheung had an agreement to distribute cocaine.

A. <u>Darnell Harris</u>

To strengthen its allegation of a cocaine conspiracy between Poindexter and Cheung, the government conjured up cocaine kingpin Darnell Harris. And just who is Darnell Harris? We don't know. He

_____

[9] In its closing argument, the government made the following statements, all of which were unsupported by the evidence: "This guy [Poindexter] has been making drug profits, and he's keeping the business going. He is buying tickets, the cost of doing business, to get to L.A. He is taking his buddy to carry the drugs, buying his ticket, too; plopped down the cash." J.A. at 370 (government closing argument). "Again, why is conspiracy a separate offense? Because it allows the Poindexters of the world to smile and say, `Sure, search me. I didn't have the drugs.'" <u>Id.</u> at 369 (same). As explained below, there is no evidence in the record that Poindexter made "drug profits." There is absolutely no evidence how Poindexter or Cheung traveled to Los Angeles or whether they traveled together. There is no evidence who paid for their tickets or the means by which the tickets were paid. There is no evidence that Poindexter paid for Cheung's ticket from Los Angeles to Virginia. There is no evidence that Poindexter paid for his own ticket. There is little evidence that Poindexter and Cheung knew each other before the flight.

18

did not testify. No statements of his were admitted. In its closing argument, the government candidly admitted, "And the inference -- for example, <u>we don't know who was in Los Angeles.</u> But the reasonable inference is, it is somebody who provided the cocaine." J.A. at 357 (emphasis added).[10] Yet, the government offered no evidence in support of this "reasonable inference." Despite this leap in logic, the trial court allowed the government to argue to the jury that Harris was connected to the alleged conspiracy.

At bottom, the government had no evidence of a cocaine connection between Poindexter and Harris. The only evidence on which to base an association between Poindexter and Harris is that (1) in the month preceding Poindexter's arrest, there were repeated calls from Poindexter's residence to a Los Angeles pager registered to Darnell Harris; (2) Poindexter's pager contained Harris's pager number; and (3) after the arrests, a resident of Poindexter's household other than Poindexter telephoned Harris's Los Angeles pager number. Even though the evidence indicates that Poindexter did not live alone,[11] the government asserted that it was Poindexter who called Harris's pager in the month preceding the arrests. The government also asserted that a postarrest call from a public phone to Poindexter's residence and a later call from his residence to Los Angeles was "all Poindexter activity." J.A. at 366. The government speculated about the content of these calls: "He is making sure that the word gets back to L.A., `We have been popped, guys, we have been popped.'" <u>Id.</u> at 366-67. Yet the government had no evidence of the content of or motive behind the calls. Perhaps Harris was a relative that one of Poindexter's family

_____

[10] <u>See also</u> J.A. at 213 ("Q: You don't know who [the cocaine] came from? A: No. Q: You don't know where it came from, other than -- A: Not specifically, no. . . . THE COURT: Where in Los Angeles it came from? A: Where, from whom, that's right.") (testimony of Agent Oliff).
[11] While Poindexter was in jail, someone at Poindexter's residence received a phone call from the jail. Later, a call was placed from Poindexter's residence to Harris's Los Angeles pager number. The fact that someone in Poindexter's residence received a call and made a call while Poindexter was incarcerated indicates that Poindexter did not live alone. Therefore, it cannot be assumed that only Poindexter could have made the nineteen telephone calls to Harris's pager during the month preceding the arrests.

19

members planned to visit. Perhaps Harris was a medical doctor Poindexter trusted. Perhaps Harris was a friend Poindexter visited, and when Poindexter was arrested, someone in Poindexter's home called Harris to tell him. We just don't know. The government's "proof" is nothing more than an unsubstantiated assertion that Poindexter arranged to buy cocaine over the telephone. Surprisingly, the majority adopts the government's theory: "Other telephone activity connected Poindexter to an ongoing business enterprise. A number which was displayed on Poindexter's pager just after his arrest was a pager number in Los Angeles. This Los Angeles pager number had previously been called by Poindexter from his home nineteen times between September 8 and October 18." Majority Op. at 6. This conclusion is based on pure conjecture.

B. Tewana Freeman

The same can be said of the government's evidence concerning Tewana Freeman; Freeman is another phantom coconspirator about whom we know nothing. She did not testify. No statements of hers were admitted. The government offered no evidence to connect her to Cheung's cocaine. What's worse, the government can't say who Tewana Freeman is: "Tewana Freeman, whoever this is." See J.A. at 361 (government closing argument) (emphasis added). Despite the government's admitted ignorance as to Freeman's identity, the trial court allowed jury argument that Freeman was connected to the alleged conspiracy and that she linked Poindexter to the conspiracy.

Both the government and the majority assume that Freeman participated in a "larger, ongoing enterprise" to distribute cocaine in Washington, D.C.[12] based on the following evidence: (1) Freeman stayed at a Connecticut Best Western in August[13] and then again in October, checking into the motel on October 17, the same day that Cheung

_____

[12] That the government and the majority presume Freeman's involvement in the conspiracy can be inferred from her role in the government's case against Poindexter. If the government and the majority did not believe Freeman was involved in the conspiracy, her travel plans and her phone calls would be completely irrelevant to this case.

[13] A telephone call from the motel was placed to Cheung's pager during Freeman's August stay.

20

transported the cocaine from Los Angeles to Virginia; (2) she called both Poindexter and Cheung from the Connecticut Best Western after their arrests;[14] and (3) Freeman's phone number was transferred one week after the arrests to the number Cheung gave as his home number. The government offered no evidence to show why Tewana Freeman stayed at the Connecticut Best Western on either occasion. Neither did the government explain why, if Freeman was part of a "larger, ongoing enterprise" to distribute cocaine in Washington, D.C., she traveled to Connecticut on the day Cheung brought the cocaine to Virginia. Nonetheless, the government and the majority rely on Freeman's postarrest calls as proof of a shared criminal enterprise.[15] Despite the government's allegation that Poindexter and Cheung formed a criminal agreement, an examination of the telephone records reveals that Freeman's postarrest call to each of them is the only telephonic link between Poindexter and Cheung. There is no evidence that Poindexter and Cheung ever telephoned each other or paged each other. There is no evidence that they used Freeman as an intermediary. The only reasonable inference to be drawn from Freeman's calls to Poindexter and Cheung is that Poindexter and Cheung both know Freeman. That Poindexter and Cheung know a common third party, however, does not provide a basis for the inference that Poindexter knew about or participated in Cheung's criminal activity.

Furthermore, the government's suspicion that Freeman's call to each of the parties concerned the cocaine transaction is not supported by any evidence. It is critical to remember that we are not to grant the government all possible inferences from the facts, only those that are reasonable and logically compelled. See Evans-Smith v. Taylor, 19 F.3d 899, 908 n.22 (4th Cir.) ("While all inferences must be made in favor of the prosecution, leaps of logic should not be."), cert. denied, 513 U.S. 919 (1994). Because the government offered no evidence of Freeman's motive for making the calls or of the content of the calls,

_____

[14] In September, someone in Freeman's home placed a call to Poindexter's pager. There was no evidence of another call until after the October arrests.

[15] The majority describes Freeman's calls as part of the "interrelated phone call activity that suggest[s] a larger, ongoing enterprise." Majority Op. at 11.

21

the jury had only timing to consider, that is, that the calls were made after Poindexter's and Cheung's arrests. Timing alone is insufficient to support the inference that the content of the calls concerned a cocaine distribution agreement between Poindexter and Cheung. Cf. United States v. Galvan, 693 F.2d 417, 420 (5th Cir. 1982) (pre- and postarrest timing of "flurry" of calls between alleged coconspirators' residences was insufficient to support inference that content of calls was alleged conspiracy).

C. Recent Cash Expenditures and Rule 404(b)

To set the stage for the alleged intrigue, the government claimed that Poindexter showed signs of profiteering in the drug trade. The government offered as evidence Poindexter's $11,000 cash purchase of a car at an auction four months before the charged conspiracy. The government speculated that, because Poindexter bought the car for cash during a period of unemployment, he must have purchased the car with drug proceeds.[16] The government then argued that because Poindexter purchased the car in June with drug proceeds, he must have conspired with Cheung four months later to distribute cocaine.[17]

_____

[16] The government argued: "And why do we know that Poindexter is involved in cocaine? Because he is purchasing, for $11,000 in cash, this unemployed guy -- you've got the records there-- where he is buying a Lexus, and he plops down $11,000 in cash. . . . The unemployment is at issue because he had no legitimate income to buy a Lexus, no legitimate income to buy a cash ticket to and from California, no legitimate income to buy a pager for cash, with extra nationwide coverage, no legitimate income to carry on his business activity. He is employed, all right. He is employed in the drug business." J.A. at 363, 402-03 (government closing argument).

[17] "And he plops down $11,000 in cash drug proceeds to buy a Lexus automobile. He has nationwide coverage on the beeper. Again, all of that evidence goes to each of those counts. Is this guy a drug dealer? If you think he had a beeper to call girl friends, acquit him. If you think that beeper was for drug dealing -- if you think that the $11,000 just plopped down in the bank account as some miraculous something from heaven, acquit him. But you can't overlook that $11,000, and you can't overlook the natural and reasonable inferences of where it came from." J.A. at 370-71 (government closing argument).

Evidence of the car purchase should never have been admitted over the defendant's objection. Despite the trial court's broad discretion in determining whether to admit Rule 404(b) evidence, admission of this evidence amounted to an abuse of discretion. First, the purchase is too remote in time to the charged conduct, and the government offered no evidence connecting the car purchase with the alleged conspiracy. Second, as demonstrated during closing argument, the government offered the evidence for the improper purpose of a propensity argument.

Poindexter's June car purchase is too remote in time to the conspiracy, charged as beginning in October. The majority correctly cites United States v. Grandison for the proposition that "recently expended large sums of cash" may be relevant in drug prosecutions. See Majority Op. at 9 (quoting United States v. Grandison, 783 F.2d 1152, 1156 (4th Cir.), cert. denied, 479 U.S. 845 (1986)). However, this court has limited evidence of such expenditures to cases in which unexplained wealth is contemporaneous with charged conduct. See, e.g., United States v. McMillon, 14 F.3d 948, 954, 955 (4th Cir. 1994) (allowing evidence of defendant's unexplained wealth "through the period of the indicted conspiracy") (emphasis added); Grandison, 783 F.2d at 1154, 1156 (allowing evidence that defendant's briefcase was full of cash contemporaneous with charged conspiracy). In fact, the very cases cited by the majority limit evidence of large cash expenditures to those made during the period in which the unlawful conduct occurred. See Majority Op. at 9 (citing United States v. Penny, 60 F.3d 1257, 1263 (7th Cir. 1995) ("[E]vidence of wealth . . . . must relate to wealth acquired during the period in which the narcotics trafficking occurred.") (emphasis added) (citation omitted), cert. denied, 116 S. Ct. 931 (1996); United States v. Figueroa, 976 F.2d 1446, 1451 & n.3, 1454 & n.7 (1st Cir. 1992) (allowing evidence of wealth contemporaneous with charged conduct), cert. denied, 507 U.S. 943 (1993)). Poindexter's purchase of the car four months earlier can hardly be considered "recent" or "contemporaneous" with the October conspiracy and, therefore, should not have been admitted as evidence.

Further, the government offered no evidence connecting the car purchase to the alleged conspiracy with Cheung. In United States v. Rawle, this court found prior bad acts admissible under Rule 404(b)

23

only when the evidence was "(1) relevant to an issue other than character, (2) necessary, and (3) reliable." 845 F.2d 1244, 1247 (4th Cir. 1988). This court elaborated that "[i]n order for the evidence to be relevant, it must be sufficiently related to the charged offense." Id. at 1247 n.3; see United States v. Hernandez, 975 F.2d 1035, 1039, 1042 (4th Cir. 1992) (excluding evidence that defendant possessed a previously used recipe for crack cocaine because evidence"did not establish anything about her conduct or mental state during the course of the conspiracy alleged in the indictment") (emphasis added). "Necessary" has been defined as "an essential part of the crimes on trial or . . . [that which] furnishes part of the context of the crime." Rawle, 845 F.2d at 1247 n.4 (citations omitted). Because Poindexter's car purchase was not an "essential part of the crime," that is, the government could not show that it related to the alleged conspiracy or that it "furnish[ed] part of the context of the crime," the trial court should have excluded evidence of the purchase as irrelevant. See id. at 1247 nn.3-4. Also, there is nothing inherently suspicious about Poindexter's payment in cash; it is common knowledge that buyers at auction often pay cash for their purchases. Although the government brazenly stated to the jury that Poindexter could only have obtained the cash from cocaine profits, it offered no evidence to connect the money to cocaine sales.

Moreover, the government offered evidence of the car purchase for an improper propensity argument. Rule 404(b) excludes evidence of prior acts if offered to show a defendant's propensity to engage in such conduct. FED. R. EVID. 404(b). Yet the government repeatedly violated this prohibition in its closing argument:"And why do we know that Poindexter is involved in cocaine? Because he is purchasing, for $11,000 in cash, this unemployed guy -- you've got the records there -- where he is buying a Lexus, and he plops down $11,000 in cash." J.A. at 363 (government closing argument); see also id. at 364, 370-71, 402-03, 405 (same). Because the government offered this evidence in violation of Rule 404(b), it should have been excluded from the jury's consideration.

D. Mumbled Obscenity

The government also resorted to the ambiguous evidence of Poindexter's mumbled epithet, "shit," allegedly uttered in reaction to

24

DEA Task Force agents' questioning of Cheung. The government offered this evidence as proof of Poindexter's knowledge that Cheung carried cocaine. Poindexter's knowledge is a critical element in the alleged agreement because, without his knowledge of the cocaine, the agreement cannot be inferred from other circumstances. See Ingram v. United States, 360 U.S. 672, 680 (1959) ("Without the knowledge, the intent cannot exist.") (quoting Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943)). Furthermore, "evidence of knowledge must be clear, not equivocal." Id. (emphasis added) (quoting Direct Sales, 319 U.S. at 711).

There is no "clear" evidence that Poindexter knew Cheung carried cocaine. The government offered an explanation but no proof as to why Poindexter cursed. Further, the evidence weighs against the government's explanation: Poindexter's utterance occurred after he rounded a corner. Thus, he could not see the scene to which his epithet allegedly related.[18] Although the jury could consider the sequence of events, it could only speculate as to the cause of Poindexter's outburst. This falls short of the clear and unequivocal proof of knowledge required.

E. Alleged Nervousness and Agitation

Another ambiguous factor relied on by the majority is testimony regarding Poindexter's alleged nervousness and agitation during the police confrontation. The majority proposes that Poindexter's anxiety implicates him in the conspiracy. See Majority Op. at 11. Few innocent people maintain absolute calm when singled out for police questioning. See United States v. Bloom, 975 F.2d 1447, 1458 (10th Cir. 1992). For this reason, little weight should be given to such factors as nervousness and agitation, absent the witness's familiarity with the subject's usual demeanor. The agent who testified as to Poindexter's demeanor did not know Poindexter and was unfamiliar with his usual demeanor. During questioning, the agent only noticed that Poindexter

_____

[18] "Q: Now, at this moment[when Agent Buss approached Poindexter and before Poindexter cursed], Agent, is Cheung out of his sight, or can he still see Cheung? A: He could not see him. . . .[T]he wall or the glass is obstructing his vision of both Mr. Cheung and Task Force Agents Oliff and Jacobson." J.A. at 310 (testimony of Agent Buss).

25

moved his weight from foot to foot, not unusual behavior after an extended flight. When cross-examined, the agent stated that Poindexter did not sweat, stutter, or mispronounce words during questioning. J.A. at 300 (testimony of Agent Buss). In the absence of these objective signs of nervousness and any familiarity with Poindexter, the agent's assertion that Poindexter appeared nervous must be considered a purely subjective determination. As such, it should be accorded little weight when assessing the totality of the circumstances.

F. Alleged Flight Because of Guilt

The majority also states that Poindexter and Cheung "split up after seeing the agents approach them from behind." See Majority Op. at 11. The majority interprets evidence offered at trial to show guilt by flight. However, the record does not support the majority's conclusion; there is only testimony that Poindexter and Cheung spoke briefly and then parted while the agents were twenty feet behind them. See J.A. at 138-39, 201, 203, 206-07 (testimony of Agent Oliff); id. at 283 (testimony of Agent Buss). Agent Buss testified that Poindexter observed DEA agents approach Cheung, but only after Poindexter and Cheung parted. Id. at 283, 285, 304. Because there was no testimony that Poindexter or Cheung saw the agents before they spoke and parted company, the majority cannot infer that the agents' approach caused Poindexter and Cheung to separate. Cf. United States v. Beahm, 664 F.2d 414, 420 (4th Cir. 1981) ("If the government wishes to offer evidence of flight to demonstrate guilt, it must ensure that each link in the chain of inferences . . . is sturdily supported.").

G. Pager

By far the most absurd piece of evidence on which the majority relies, however, is Poindexter's possession of a pager with nationwide service. The majority accepts without question the prosecution's argument that pagers are tools of the drug trade, particularly when the owner has nationwide service without a "legitimate" need. The implications of this argument are disturbing. Apparently, it is now for the government to decide which citizens have a "legitimate" need for pagers with nationwide service. If a defendant falls outside the class of

26

citizens with "legitimate" needs, a rebuttable presumption of criminal activity is established.

Thousands, perhaps millions, of Americans uninvolved in drug trafficking or any unlawful activity routinely use pagers for business, recreational, and family purposes. Absent proof that a specific pager is used for unlawful purposes, the government cannot ask citizens to justify their ownership. In this case, the government offered no evidence to show that Poindexter used his pager for unlawful purposes. Again, calls from Tewana Freeman and Darnell Harris do not support an inference of Poindexter's criminal activity because the government had no proof that Freeman or Harris participated in the alleged conspiracy. Because there is no evidence that Poindexter used his pager for unlawful purposes, and because mere possession is not enough to establish an inference of criminal activity, evidence of Poindexter's pager ownership is irrelevant.

III. <u>THE MAJORITY'S "COMPLETE PICTURE"</u>

Poindexter's convictions rest on weak circumstantial evidence of association with a criminal and the majority's presumption of Poindexter's guilt. There is no evidence to connect Poindexter to Cheung's cocaine. There is also no evidence to show a conspiracy with Cheung. Rather than critically examining the evidence to determine whether it overcomes a presumption of Poindexter's innocence,[19] the majority relies on a "complete picture" composed of nothing but associational facts and speculative inferences consistent with unlawful conduct. <u>See</u> Majority Op. at 11. However, "[t]o start with the assumption that the crime was committed and then to show that each piece of circumstantial evidence can be explained in a consistent manner is fundamentally different from examining each piece of evidence and finally concluding beyond a reasonable doubt that the defendant

_____

[19] <u>**See United States v. Villegas**</u>, 911 F.2d 623, 630 (11th Cir. 1990) (in reviewing the sufficiency of the evidence "the presumption of innocence remains constant, irrespective of the heinous nature of condemned activity, as does the requirement that the government prove its case beyond a reasonable doubt, notwithstanding the presence of mere suspicion and speculation"), <u>cert. denied</u>, 499 U.S. 997 (1991).

27

was guilty." <u>Evans-Smith v. Taylor</u>, 19 F.3d 899, 910 (4th Cir.), <u>cert. denied</u>, 513 U.S. 919 (1994).

How many citizens travel together, know each other, know the same people, receive calls from common parties, and carry pagers? If one of those persons carries drugs, should these associational facts be enough to convict the other of a criminal agreement? Clearly, the answer is no. The closest of associations can never be enough to sustain a conviction. <u>United States v. Villegas</u>, 911 F.2d 623, 630 (11th Cir. 1990) ("Knowing participation in a conspiracy . . . cannot be proved solely by a family relationship or other types of close association."), <u>cert. denied</u>, 499 U.S. 997 (1991). Guilt is "personal and not a matter of mere association." <u>Barenblatt v. United States</u>, 360 U.S. 109, 150 (1959) (Black, J., dissenting from opinion affirming contempt of Congress conviction for refusal to answer questions relating to present or past membership in Communist Party) (citation omitted).

In this case, the totality of the circumstances does not amount to proof beyond a reasonable doubt of a criminal agreement, but only a cumulation of suspicion and speculation. <u>There is no evidence</u> from which a jury could find beyond a reasonable doubt that Poindexter agreed with Cheung to possess with intent to distribute nearly a kilogram of cocaine. Accordingly, I would reverse Poindexter's conspiracy conviction. Because of the deficiencies in the evidence discussed above, I would also reverse Poindexter's aiding and abetting and Travel Act convictions.[20]

Again, I respectfully dissent.

_____

[20] I would also find that Poindexter was arrested at the moment he was handcuffed and that there was insufficient probable cause at that time. For the purposes of this discussion, however, I have treated the items obtained pursuant to that arrest as properly seized.

28